## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**DEBBIE LEE**                                                      **PLAINTIFF**


**v.**                           **No. 4:20-CV-197 (BSM)**


**LIGHTHOUSE COMPLIANCE SOLUTIONS, INC.**
**and DAVID ANKENY**                                    **DEFENDANTS**

### BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants Lighthouse Compliance Solutions, Inc. (Lighthouse or Company) and David Ankeny (Ankeny), by and through their undersigned counsel, CROSS, GUNTER, WITHERSPOON & GALCHUS, P.C., and for their Brief in Support of their Motion for Summary Judgment, respectfully request that the Court dismiss Plaintiff's Complaint, with prejudice, and enter judgment in favor of Lighthouse on its Counterclaim for breach of contract.

Respectfully Submitted,

Abtin Mehdizadegan, Ark. Bar No. 201313
Alexander D. Clark, Ark. Bar No. 2017112
**CROSS, GUNTER, WITHERSPOON**
   **& GALCHUS, P.C.**
500 President Clinton Avenue, Suite 200
Little Rock, Arkansas 72201
Phone: (501) 371-9999
Fax: (501) 371-0035
abtin@cgwg.com
aclark@cgwg.com

**ATTORNEYS FOR DEFENDANTS**

256626

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...............................................................................ii

**I.    INTRODUCTION** ............................................................................... 1

**II.   UNDISPUTED MATERIAL FACTS** ........................................................ 2

**III.  LEGAL STANDARD** ..........................................................................11

**IV.   ARGUMENT** ................................................................................... 12

      A.    The Evidence Demonstrates that Plaintiff Was Properly Classified as an Administratively Exempt Employee. ........................................... 12

           1.    The undisputed facts establish that Plaintiff was paid on a salary basis. ....................................................................... 14

           2.    Plaintiff exclusively performed office or non-manual labor directly related to the management or general business operation of Lighthouse and its customers. ........................................... 14

           3.    Plaintiff's primary duties as Director of Applicant Harbor Operations required her to exercise discretion and independent judgment on behalf of Lighthouse with respect to matters of extreme significance for its customers. ........................................... 18

      B.    Plaintiff was Properly Exempt Under the FLSA's "Combination" Exemption. ...................................................................... 32

      C.    Plaintiff Did Not Work Overtime. .................................................. 34

      D.    Plaintiff Cannot Prove any Willful Violation of the FLSA or AMWA ......... 37

      E.    Plaintiff Released and Waived Her Right to Bring a Claim under Either the FLSA or the AMWA in Exchange for Valuable Consideration. ................. 38

      F.    Defendants Are Entitled to Summary Judgment on Their Counterclaim.  41

**V.    CONCLUSION** ...............................................................................44

## <u>TABLE OF AUTHORITIES</u>

CASES

*Aubrey v. Zamam, LLC,*
  2017 WL 5180427 (E.D. Ark. Nov. 8, 2017) ................................................................. 13

*Ballard Grp., Inc. v. BP Lubricants USA, Inc.,*
  436 S.W.3d 445 (Ark. 2014) .......................................................................................... 44

*Bennet v. Carl's Towing, L.L.C.,*
  2005 WL 2101002 (W.D. Mo. 2005)............................................................................. 37

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ...................................................................................................... 11

*Chao v. Barbeque Ventures, LLC,*
  547 F.3d 938 (8th Cir. 2008).......................................................................................... 38

*Copeland v. ABB, Inc.,*
  521 F.3d 1010 (8th Cir. 2008) ....................................................................................... 39

*Encino Motorcars v. Navarro,*
  138 S. Ct. 1134 (2018).................................................................................................... 13

*Fascio v. Madison Health & Rehab LLC,*
  No. 4:12CV00600 (E.D. Ark. June 30, 2014) .............................................................. 40

*Forrester v. Roth's I. G. A. Foodliner, Inc.,*
  646 F.2d 413 (9th Cir. 1981) ......................................................................................... 34

*Friedman v. Nat'l Indem. Co.,*
  No. 8:16-CV-258, 2018 WL 1954218 (D. Neb. Apr. 13, 2018) ..................................... 32

*Grage v. N. States Power Co.-Minnesota,*
  813 F.3d 1051 (8th Cir. 2015) ....................................................................................... 15

*Gregory v. City of Rogers, Ark.,*
  974 F.2d 1006 (8th Cir. 1992), cert. denied, 507 U.S. 913 (1993) ................................ 12

*Helfter v. United Parcel Serv., Inc.,*
  115 F.3d 613 (8th Cir.1997) ........................................................................................... 12

*Holloway v. Pigman,*
  884 F.2d 365 (8th Cir. 1989) ......................................................................................... 12

*IntraComm, Inc. v. Bajaj*,
   492 F.3d 285 (4th Cir. 2007) .................................................................. 32

*Johnson Regional Medical Ctr. v. Halterman*,
   867 F.3d 1013 (8th Cir. 2017) ................................................................ 11

*Kertis v. Parkway Vill., Inc.*,
   No. 4:18-CV-650, 2019 WL 7163429 (E.D. Ark. Nov. 12, 2019) ................... 34

*Langston v. Summit Health & Rehab., LLC*,
   2015 WL 4528662 (W.D. Ark. July 27, 2015) ............................................ 37

*Lynn's Food Stores, Inc. v. U.S. By and Through U.S. Dept. of Lab., Employment
   Standards Admin., Wages and Hour Div.*,
   679 F.2d 1350 (11th Cir. 1982) .............................................................. 40

*Lyons v. ConAgra Foods Packaged Foods, LLC*,
   No. 4:12-CV-245, 2013 WL 12304019 (Oct. 31, 2013) ................................ 40

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)............................................................................ 11

*McCartney v. Bailey & Thompson Tax and Accounting, P.A. LTD*,
   No. 4:14-CV-561, Dkt. 12 (E.D. Ark. Feb. 19, 2015) ................................... 40

*McLaughlin v. Richland Shoe Co.*,
   486 U.S. 128 (1988) ........................................................................... 37

*Miner v. Local 373*,
   513 F.3d 854 (8th Cir. 2008) ................................................................ 11

*O'Bryan v. KTIV Television*,
   64 F.3d 1188 (8th Cir.1995) ................................................................. 12

*Perry v. Baptist Health*,
   189 S.W.3d 54 (Ark. 2004) .................................................................. 44

*Ray v. Henderson*,
   221 F.3d 1343 (8th Cir. 2000) .............................................................. 12

*Stofer v. James Greene & Assocs., Inc.*,
   No. 4:20-CV-00027-KGB, 2021 WL 1148708 (E.D. Ark. Mar. 25, 2021).......... 15, 16, 45

*United Health Group Inc. v. Executive Risk Specialty Ins. Co.*,
   870 F.3d 856 (8th Cir. 2017) ............................................................... 11

*Viola v. Comprehensive Health Mgmt.,*
   441 Fed. App'x 660 (11th Cir. 2011) .................................................................. 18

**STATUTES**

29 U.S.C. § 207 ............................................................................................................ 12

29 U.S.C. § 213 ............................................................................................................ 13

29 U.S.C. § 216 ........................................................................................................... 40

29 U.S.C. § 255 ........................................................................................................... 36

ARK. CODE ANN. § 11–4–211 ................................................................................... 13

**RULES**

FED. R. CIV. P. 56 ........................................................................................................ 11

**REGULATIONS**

29 C.F.R. § 202 ..................................................................................................... 18, 19

29 C.F.R. § 541.100 ............................................................................................... 32, 33

29 C.F.R. § 541.200 .......................................................................................... 13, 14, 18

29 C.F.R. § 541.201 ...................................................................................................... 15

29 C.F.R. § 541.202 ..................................................................................... 18, 19, 25, 30

29 C.F.R. § 541.602 ...................................................................................................... 14

29 C.F.R. § 541.700 .......................................................................................... 14, 15, 17

29 C.F.R. § 541.708 ............................................................................................... 32, 33

84 Fed. Register 51230 (Sept. 27, 2019) ................................................................... 13

ARK. ADMIN. CODE § 010.14.1-112 ......................................................................... 39

## I.   INTRODUCTION

Plaintiff Debbie Lee (Plaintiff) filed this lawsuit alleging Lighthouse and Ankeny misclassified her as an "exempt" employee for wage and hour purposes under the Fair Labor Standards Act (FLSA) and the Arkansas Minimum Wage Act (AMWA) and failed to pay her overtime in her capacity as Director of Applicant Harbor Operations.

As demonstrated below, for the entire duration of her employment, Lighthouse properly classified and compensated Plaintiff as an "exempt" employee under the FLSA's "administrative" exemption, or alternatively under a combination of multiple white-collar exemptions. Plaintiff's work as Director of Applicant Harbor Operations primarily required the perpetual exercise of discretion and independent judgment with respect to matters of significance within Lighthouse and to Lighthouse's clients. The guidance and advice she routinely provided, without supervision, were based on her own assessment and analysis of each client's needs, as well as her knowledge and understanding of human resource management and regulatory compliance in a hyper-niche area of employment law that pertains to affirmative action obligations of federal contractors.

Contrary to her allegations here, prior to filing this lawsuit, Plaintiff repeatedly acknowledged, affirmed, and declared both that she was an exempt employee and that she performed duties that are squarely within the ambit of the administrative exemption. Accordingly, Defendants respectfully request that the Court grant their Motion for Summary Judgment and dismiss Plaintiff's Complaint, with prejudice.

Additionally, Lighthouse filed a Counterclaim against Plaintiff for breaching the Confidential Severance Agreement (Severance Agreement) she signed in exchange for valuable consideration shortly after her employment was terminated. The Severance

Agreement required, among other things, that Plaintiff abstain from soliciting employment from Lighthouse clients after her termination for a period of three years. Plaintiff freely admits that she solicited employment from a Lighthouse client, and she also breached the agreement by filing this action despite her waivers to the contrary. Accordingly, summary judgment is also appropriate in favor of Lighthouse on its Counterclaim.

## II.   UNDISPUTED MATERIAL FACTS

Lighthouse is an Arkansas corporation that, since its formation in 1997, has specialized in providing affirmative action compliance services for federal contractors. Lighthouse offers two primary services: affirmative action planning (AAP) and an applicant tracking system (ATS), each of which is a recognized division within Lighthouse's organizational structure. **Exhibit 1**, *Supplemental Declaration of Lorey Phillips*, at ¶ 6.

Lighthouse's ATS, known as "Applicant Harbor," is a web-based hiring, applicant, and data management software system that Lighthouse clients integrate into their own websites to maintain compliance with certain governmental guidelines and regulations, including those promulgated by the Equal Employment Opportunity Commission (EEOC) and the Office of Federal Contract Compliance Programs (OFCCP).[1] *See* **Exhibit 2**, *Plaintiff's Résumé*; **Exhibit 3**, *Supplemental Declaration of D. Ankeny*, at ¶ 10. The Applicant Harbor system is highly customizable. *Ex. 3*, at ¶ 10.

---

[1] Applicant Harbor systems are designed to ensure that when a Lighthouse client posts a position for employment, every candidate using the Applicant Harbor system is considered in a fair and unbiased way, thereby reducing the client's risk of litigation or regulatory enforcement action.

In May 2006, Lighthouse hired Plaintiff to serve as Director of Applicant Harbor Operations. *Id.* at ¶ 6; **Exhibit 4**, *Deposition of Debbie Lee*, at P. 21, 295; *Dkt. 1*, ¶¶ 8, 23, 25.[2] During the relevant time period, Lighthouse had a total of seven employees: (1) Plaintiff, Director of Applicant Harbor Operations; (2) Greta Gay, Director of Affirmative Action Planning; (3) David Ankeny, President; (4) Garth Robinson, Chief Operating Officer; (5) Lorey Phillips, Controller; (6) Loryn Fugate, who was hired to support Plaintiff as Client Service Specialist, but who later assumed the position of Director of Applicant Harbor Operations following Plaintiff's termination for misconduct; and (7) Jeremy Brasher, AAP Data Specialist. *Ex. 1* (Phillips Supp. Decl.) at ¶ 7.

Plaintiff earned a base salary of $61,800.00 per year, and she also received bonuses for bringing on new clients as well as additional profit-sharing compensation. *Id.* at ¶ 10. With bonuses and profit-sharing compensation, Plaintiff made over $76,000 and $71,000 in 2017 and 2018, respectively. **Exhibit 5**, *Payroll Records*; *see also* **Exhibit 7**, *Collection of Email Correspondence Regarding SPIFF Payments*.

During Plaintiff's tenure as Director of Applicant Harbor Operations, she reported directly to Lighthouse President David Ankeny. *Ex. 4* (Plaintiff's Depo.) at P. 22. If Ankeny was unavailable, Plaintiff reported to Mr. Robinson, who she described as the "programmer" for Applicant Harbor. *Id.* at P. 22, 48–49; *Ex. 3* (Ankeny Supp. Decl.) at ¶ 6. Plaintiff was not required to maintain a specific work schedule or specific work hours. *Ex. 4* (Plaintiff's Depo.) at P. 258.

---

[2] *See also* **Exhibit 24**, *Plaintiff's Business Card* (identifying Plaintiff as Director of Applicant Harbor Operations).

Plaintiff's job duties involved primarily office work and exclusively non-manual work. Plaintiff managed *all* operations of Applicant Harbor, working directly with clients to train them on configuring Applicant Harbor systems to fit their specific needs, however unique, for the purpose of maintaining regulatory compliance. *Id.* at P. 95; *Ex. 3* (Ankeny Supp. Decl.) ¶ 15–18; **Exhibit 6**, *Supplemental Declaration of Greta Gay*, at ¶ 6–8. In Plaintiff's own words, as Director of Applicant Harbor Operations, she was "[t]he sole person in the company [who] knew how the system worked, was managed, and as such[,] [was] the sole interface with clients of the system." *Ex. 4* (Plaintiff's Depo.) at P. 95. In fact, Plaintiff "was the only person who knew how the system worked and . . . could tell people how to use it and how to use it properly." *Id.* (emphasis added).

As Director of Applicant Harbor Operations, Plaintiff provided guidance and advice related to human resource management and legal/regulatory compliance to Lighthouse clients daily. **Exhibit 8**, *Unemployment Appeal Documents*, at P. 2; **Exhibit 9**, *Plaintiff's Job Description*; **Exhibit 10**, *Collection of Email Correspondence Regarding Plaintiff's Essential Job Functions*; **Exhibit 11**, *Collection of Plaintiff's Email Correspondence Regarding Applicant Harbor*. Her communications, which were not subject to prior review or approval, were almost always exchanged with the executive management of Lighthouse clients (including presidents, CEOs, and human resource directors). *Ex. 4* (Plaintiff's Depo.) at P. 315–16. In her words, "David never approved any e-mails." *Id.* at P. 125. She simply "used [her] own discretion in determining what to send to clients." *Id* (answering, "sure, yeah" to the question presented).

Plaintiff described her management of Lighthouse's clients' individual Applicant Harbor sites to include "follow[ing] and research[ing] DOL-OFCCP and EEOC

initiates in reference to applicant tracking and AAP compliance," "[c]ontinually updat[ing] AH in reference to new regulations," "providing technical assistance to job candidates," "[s]et[ting] [up] new client's AH site and provid[ing] training to Admin Users," and "execut[ing] continuation of compliance and system enhancements." *Ex. 2* (Plaintiff's Résumé); *see also Ex. 9* (Plaintiff's Job Description).

On a more granular level, Plaintiff exercised discretion and independent judgment with respect to significant matters related to Lighthouse's clients by:

- Providing guidance and recommendations to clients in response to specific inquiries pertaining to the Applicant Harbor software. *Ex. 11* (Applicant Harbor Emails) at P. 3, 6–10, 18–19, 21–26, 29–30. For example, one client provided Plaintiff with a job description, and Plaintiff developed "qualifying questions[3]" based on the information provided by the client. *Id.* at P. 11. On another occasion, Plaintiff offered "suggestions on updating [the client's] application template," opining that it should be "much shorter." *Id.* at P. 18. Using her independent judgment, Plaintiff recommended alterations to specific sections of the application to achieve an effective and compliant, yet more concise application. *Id.*

- Advising clients how to develop applications and hiring practices that were compliant with OFCCP and EEOC regulations and guidance. **Exhibit 12**, *Collection of Email Correspondence Regarding Legal Compliance*; *see also Ex. 3* (Ankeny Supp. Decl.) at ¶ 18; *Ex. 2* (Plaintiff's Résumé). She informed clients on the duration of time applicant data must be retained as a matter of law, *Ex. 12* (Legal Compliance Emails) at P. 5, 8; advised clients that engaging in a "pattern" of certain conduct would "show discrimination," *id.* at P. 6; opined as to why a Lighthouse competitor's "process [was] not at all compliant with EEO or OFCCP compliance regulations," and provided her suggestions to ensure compliance, *id.* at P. 10; made recommendation to clients based on enforcement and guidelines of governmental regulatory agencies, including the EEOC and the Consumer Financial Protection Bureau, *id.* at P. 13–14; updated a client's "application template to comply with the new Connecticut salary history ban," *id.* at P. 15; and researched and provided analysis and recommendations regarding newly enacted state legislation, *id.* at P. 23–25.

- Obtaining legal advice to support clients' legal-related needs and respond to clients' legal inquires, *Ex. 3* (Ankeny Supp. Decl.) at ¶ 22.

---

[3] A "qualifying question" is a question in an application that requires the applicant answer "yes" in order to viewed as basic qualified.

- Providing human resource guidance relating to the recruitment and legally-compliant hiring processes. *Ex. 9* (Job Description); **Exhibit 13**, *Plaintiff's LinkedIn Profile*; **Exhibit 14**, *Collection of Email Correspondence Regarding Human Resource Guidance*; *see also Ex. 3* (Ankeny Supp. Decl.) at ¶ 18, 43; *Ex. 6* (Gay Supp. Decl.) at ¶ 10. This included advice on how reduce turnover, *Ex. 14* (HR Guidance Emails) at P. 5; diligently editing and revising a client's application and making detailed notes for the client, *id.* at P. 6–21; providing "ideas about adding to [a client's] onboarding/orientation process," *id.* at P. 34–35; and even engaging in impromptu recruiting on behalf of a Lighthouse client, *id.* at P. 36.

- Providing guidance to clients pertaining to posting requirements on state job boards, *see* **Exhibit 15**, *Collection of Email Correspondence Regarding Third Party Communications*, at P. 1, 8; and opinions and advice regarding posting applications on online job board, *id.* at P. 2–7, 9–10.

- Communicating with online job boards on behalf of Lighthouse clients, *id.* at P. 7–8, 11–12; *Ex. 3* (Ankeny Supp. Decl.) at ¶ 19.

- Entering into contracts with clients on behalf of Lighthouse, **Exhibit 16**, *Applicant Harbor System Services Agreements*; **Exhibit 17**, *Collection of Email Correspondence Regarding Contracting Authority*; *see also Ex. 3* (Ankeny Supp. Decl.) at ¶ 23; *Ex. 6* (Gay Supp. Decl.) at ¶ 10; Dkt. 7-4 (Declaration of Garth Robinson), at ¶ 11.

- Setting prices for products and services related to Applicant Harbor, **Exhibit 18**, *Collection of Email Correspondence Regarding Price Setting*, including storage fees, *id.* at P. 1, monitoring fees, *id.* at P. 2, and setting, waiving, and negotiating fees associated with the use of Applicant Harbor itself. *Id.* at P. 3–16; *see also Ex. 3* (Ankeny Supp. Decl.) at ¶ 24; *Ex. 6* (Gay Supp. Decl.) at ¶ 11–13.

In performing the foregoing duties, Plaintiff's decisions, guidance, and advice to Lighthouse clients were not subject to prior approval or review. *See Ex. 4* (Plaintiff's Depo.) at P. 315–16; *Ex. 3* (Ankeny Supp. Decl.) at ¶ 22–24, 34.

Plaintiff's execution of Applicant Harbor System Service Agreement on behalf of Lighthouse and authority to set, waive, and negotiate prices and fees associated with Applicant Harbor, as well as other Lighthouse services, was also performed without prior approval. *See Ex. 3* (Ankeny Supp. Decl.) at ¶ 22–24, 34; *see also Ex. 6* (Gay Supp. Decl.) at ¶ 16; *Ex. 16* (AH Service Agreements) (executed contracts on behalf of

Lighthouse); *Ex. 18* (Price Setting and Contracting Authority Emails). In her own words, because fees were "not written on a policy or a guideline[—i]t was just willy-nilly up in the air"—she used her own authority in deciding what fees to set. *Ex. 4* (Plaintiff's Depo.) at P. 198.

Plaintiff, on her own initiative, also took on the role as "head of marketing." **Exhibit 19**, *Collection of Email Correspondence Regarding Marketing*, at P. 6; *Ex. 3* (Ankeny Supp. Decl.) at ¶ 25; *Ex. 1* (Phillips Supp. Decl.) at ¶ 17–19; *Ex. 6* (Gay Supp. Decl.) at ¶ 21–25. In this role, she assumed the "responsib[ility] for LH [Lighthouse] and AH [Applicant Harbor] marketing efforts." *Ex. 19* (Marketing Emails) at P. 6; *Ex. 3* (Ankeny Supp. Decl.) at ¶ 25; Dkt. 7-4 (Robinson Decl.) at ¶ 15; *Ex. 1* (Phillips Supp. Decl.) at ¶ 17; *Ex. 6* (Gay Supp. Decl.) at ¶ 24.

Plaintiff exercised discretion and independent judgment with respect to significant matters related to Lighthouse, and in particular Lighthouse's marketing, by:

- Overseeing the creation of Lighthouse's LinkedIn webpage and monitoring it after its inception, and seeking Applicant Harbor's "integration" with LinkedIn's "new recruiting tool," *Ex. 19* (Marketing Emails), at P. 1, 8–9;

- Facilitating advertisements in *HR Magazine*, *id*. at P. 14–19; *Ex. 3* (Ankeny Supp. Decl.) at ¶ 31; Dkt. 7-4 (Robinson Decl.) at ¶ 16; Ex. 4 (Plaintiff's Depo.) at P. 211–12;

- Obtaining a company listing on the Central Arkansas Human Resources Association's (CAHRA) website, *Ex. 19* (Marketing Emails), at P. 20–23;

- Sending human resources legal compliance "alerts" to clients, alerting them of new directives issued by the Department of Labor and the OFCCP, *id*. at P. 27; *Ex. 3* (Ankeny Supp. Decl.) at ¶ 33; *Ex. 2* (Plaintiff's Résumé);

- Facilitating the redesign of Lighthouse's logo, *Ex. 3* (Ankeny Supp. Decl.) at ¶ 32; *Ex. 19* (Marketing Emails) at P. 11–13;

- Developing and/or conducting training and seminars pertaining to Applicant Harbor remaining compliant in hiring practices, Ex. 8 (Unemployment Appeal Records), at P. 2; *Ex. 9* (Plaintiff's Job Description); *Ex. 19* (Marketing Emails), at P. 5;

- Drafting and implementing a security policy for Applicant Harbor. **Exhibit 21**, *July 11, 2018 Email Correspondence*; *Ex. 3* (Ankeny Supp. Decl.) at ¶ 34; and

- Overseeing the updating of Lighthouse's website, Ex. 19 (Marketing Emails) at P. 25–26; **Exhibit 22**, *Applicant Harbor Website*.

In performing these marketing duties, Plaintiff operated independently and without immediate supervision. *Ex. 4* (Plaintiff's Depo.) at P. 22, 114; *Ex. 3* (Ankeny Supp. Decl.) at ¶ 33; Dkt. 7-4 (Robinson Decl.) at ¶ 20; *Ex. 1* (Phillips Supp. Decl.) at ¶ 11. In fact, Plaintiff testified that Mr. Ankeny "wasn't ever there[,]" so he would not have been able to provide immediate supervision. *Ex. 4* (Plaintiff's Depo.) at P. 130. She developed marketing strategies and identified marketing opportunities on her own. *Id.* at P. 206–07. She presented significant marketing decisions for Mr. Ankeny's consideration "based on [Lighthouse's] competition['s]" marketing efforts, *id.* at P. 209–10, 231, and—once approved—Plaintiff was responsible for pursuing and implementing the approved marketing decisions. *Ex. 1* (Phillips Supp. Decl.) at ¶ 17–19.

Plaintiff also engaged in professional networking and other related business development activities to expand Lighthouse's customer base, such as attending meetings and conferences for professional organizations on behalf of Lighthouse. *Ex. 19* (Marketing Emails) at P. 7, 10 (evidencing attendance at SHRM conference(s) and business development through contact at networking events with the Northeast Arkansas Society for Human Resource Management); *see also Ex. 3* (Ankeny Supp. Decl.) at ¶ 30; *Ex. 6* (Gay Supp. Decl.) at ¶ 27.

During her employment at Lighthouse, Plaintiff also "took the initiative to become professionally certified in [talent acquisition]" through the Society of Human Resources Management (SHRM). *Ex. 8* (Unemployment Appeal Records) at P. 2; *see also Ex. 3* (Ankeny Supp. Decl.) at ¶ 27; *Ex. 2* (Plaintiff's Résumé) ("SHRM Talent Acquisition Specialty Credential Certification"); Dkt. 7-4 (Robinson Decl.) at ¶ 18; **Exhibit 20**, *Certification Invoices*; *Ex. 4* (Plaintiff's Depo.) at P. 50–51. This is a "specialty credential" that demonstrates an individual's competency with respect to recruiting. *Ex. 4* (Plaintiff's Depo.) at P. 23–24. Plaintiff frequently provided guidance and support to clients with respect to their recruiting processes. *Id.* at P. 69.

On October 3, 2019, Lighthouse terminated Plaintiff for insubordination, frequent tardiness and absenteeism, poor work performance, and "vaping" in her office. *Ex. 3* (Ankeny Supp. Decl.) at ¶ 57–60.

On October 9, 2019, Lighthouse and Plaintiff executed a Severance Agreement in which she agreed, among other things, to release and discharge Lighthouse from any and all claims, obligations and liabilities she has or may have had . . . arising out of or related to her employment with or separation from Lighthouse, including, but not limited to, claims arising under the Fair Labor Standards Act [and] . . . the Arkansas Minimum Wage Act[.]" Plaintiff also agreed that she will not, "for a period of three (3) years from the execution of the Agreement, directly or indirectly, personally, or through any individual, firm or corporation, for her own benefit . . . solicit . . . any client or customer to whom Lighthouse provides products and/or services at the time of Lee's termination or at any time in the 12-month period preceding the date of Lee's termination." **Exhibit 23**, *Confidential Severance Agreement*; *Ex. 4* (Plaintiff's Depo.) at P. 278–79. Lighthouse performed its obligations under the Agreement by forgiving an

extant loan and paying her the equivalent of two months of her base salary for a total value of $18,450.97. *Ex. 4* (Plaintiff's Depo.) at P. 290.

After signing the Severance Agreement, Plaintiff applied for a job with Centennial Bank, who she knew was a longtime Lighthouse client. *Id.* at P. 293–94. When she received an interview request, Plaintiff contacted the Centennial employee with whom she worked while serving as Director of Applicant Harbor Operations to discuss the position. *Id.* Plaintiff admits that she breached the Agreement. *Id.* at P. 290.

On November 19, 2019, Plaintiff filed a claim for unemployment benefits, which the Arkansas Department of Workforce Services (DWS) denied on December 11, 2019. *See Ex. 8* (Unemployment Appeal Records), at P. 1.

On December 30, 2019, Plaintiff filed a Petition for Appeal of the DWS decision to the Appeal Tribunal. In her Petition for Appeal, Plaintiff declared:

> <u>My role with the company was to manage the operations of the Applicant Tracking System (ATS)</u>, Lighthouse owned. I was the sole person in the company that knew how the system worked, was managed, and as such, I was the sole interface with clients (users) of the system. The ATS system was the product and there was no product delivery to the customers without me. <u>I was an exempt, salaried employee</u> and interfaced with clients to help them post their jobs and troubleshoot the system for them beyond the standard workday, from the office or from home . . . <u>I consistently received positive feedback from clients for my professional guidance</u>, my timeliness, and my willingness to provide assistance to them . . . Over the years I sought to expand my duties by taking on additional projects with the intention of expanding our customer base by <u>professional networking, developing training and seminars, and recommending improvements to the actual system. I also took the initiative to become professionally certified</u> in (fill in the blank here with your certification) [sic].

*Id.* at P. 2 (emphasis added).

Prior to filing her lawsuit, Plaintiff believed and repeatedly represented that she was "exempt" from the overtime provisions of the FLSA. *Id.* Despite these

representations, on February 26, 2020 Plaintiff made an about face turn from her declaration to the Appeal Tribunal and filed her Complaint alleging that Lighthouse misclassified her as "exempt" for purposes of the FLSA and the AMWA. *Dkt. 1* at ¶ 1, 38, 46.

But "[y]ou know what? [Plaintiff] do[esn't] care about the money." *Ex. 4* (Plaintiff's Depo.) at P. 230. She simply wants to "fight as hard as [she] ha[s] to" so Lighthouse "will come out looking like [it] could care less about diversity and inclusion." *Id.* at P. 305. Simply put, Plaintiff is "desperate" because she "lost everything that [she] [knew] for 15 years"—she "lost [her] family." *Id.* at P. 308. While she may be upset about her termination, desperation is no basis to avoid summary judgment, and the following sections explain why the Court should dismiss each of her claims.

### III.   LEGAL STANDARD

Summary judgment is proper where, as here, there is no genuine issue of material fact for trial. *United Health Group Inc. v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing FED. R. CIV. P. 56). Additionally, summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Johnson Regional Medical Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is

insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

Once a motion for summary judgment points out the absence of proof regarding an essential element of the nonmovant's case, the burden shifts to the nonmovant to offer probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Gregory v. City of Rogers, Ark.*, 974 F.2d 1006, 1010 (8th Cir. 1992), cert. denied, 507 U.S. 913 (1993).

Self-serving, unsubstantiated deposition testimony does *not* create a material question of fact. *Ray v. Henderson*, 221 F.3d 1343 (8th Cir. 2000); *Helfter v. United Parcel Serv., Inc.*, 115 F.3d 613, 616 (8th Cir.1997) (conclusory affidavits and deposition testimony, standing alone, are insufficient to withstand summary judgment motion)); *O'Bryan v. KTIV Television*, 64 F.3d 1188, 1191 (8th Cir.1995) (granting summary judgment if non-moving party's only evidence to rebut the motion is conclusory, self-serving statements). As discussed below, Plaintiff's claims are unsubstantiated, completely controverted by all credible evidence, and under this legal standard, the Court must enter summary judgment.

## IV.  ARGUMENT

### A.  The Evidence Demonstrates that Plaintiff Was Properly Classified as an Administratively Exempt Employee.

As a general rule, the FLSA requires employers to compensate each employee "at a rate not less than one and one-half times the 'regular rate' for all overtime hours that an employee works." 29 U.S.C. § 207(a)(1). The FLSA defines overtime as employment in excess of forty (40) hours in a single workweek. *Id.* The AMWA is interpreted under

the same framework as the FLSA. *See Aubrey v. Zamam, LLC*, No. 2017 WL 5180427, at *2 (E.D. Ark. Nov. 8, 2017).

Importantly, both the FLSA and the AMWA exempt from this general rule "any employee employed in a bona fide executive, administrative, or professional capacity . . .." 29 U.S.C. § 213(a)(1) (emphasis added); ARK. CODE ANN. § 11–4–211(d) (directing that AMWA overtime requirements do not apply to employees exempt under the FLSA exemptions). Federal regulations set forth various parameters of the exemptions. 29 C.F.R. § 541.200 *et seq*.

The Supreme Court has squarely rejected the notion that exemptions should be construed narrowly when interpreting the FLSA: "Because the FLSA gives no textual indication that its exemptions should be construed narrowly, there is no reason to give [them] anything other than a fair (rather than a narrow) interpretation." *Encino Motorcars v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

A "fair reading" of the evidence conclusively establishes that Plaintiff was properly classified as exempt under the FLSA's administrative exemption because there is no material fact in dispute that she: (1) was compensated on a salary basis at a rate of not less than $455 per week[4]; (2) had the primary duty of performing office or non-manual labor directly related to the management or general business operation of Lighthouse's enterprise and its customers; and (3) exercised extreme discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a).

---

[4] This amount increased to $684 per workweek effective January 1, 2020. *See* 84 Fed. Register 51230 (Sept. 27, 2019). However, because Plaintiff's employment terminated in 2019, the applicable salary basis minimum is $455 for purposes of this litigation. In any event, Plaintiff was paid in excess of either.

There is no question that Plaintiff's compensation and job duties while employed with Lighthouse satisfy each of these criteria.

### 1. The undisputed facts establish that Plaintiff was paid on a salary basis.

The first prong of the administrative exemption requires that an employee be compensated on a salary basis at a rate of not less than $455 per week. 29 C.F.R. § 541.200(a)(1). As a general rule, "[a]n employee will be considered to be paid on a 'salary basis' which amount is not subject to reduction because of variations in the quality or quantity of work performed." 29 C.F.R. § 541.602.

Plaintiff was paid a pre-determined annual salary of $61,800, exclusive of bonuses and profit-sharing. Said another way, Plaintiff was compensated on a salary basis at a rate of $1,188.46 per week—almost three times the minimum salary basis of $455 per week. *Ex. 5* (Payroll Records). Accordingly, the first requirement of the administrative exemption is easily met and there is no genuine issue concerning 29 C.F.R. § 541.200(a)(1).

### 2. Plaintiff exclusively performed office or non-manual labor directly related to the management or general business operation of Lighthouse and its customers.

The second prong of the administrative exemption requires that an employee's primary duty "is the performance of office or non-manual labor directly related to the management or the general business operation of the employer *or its customers*." 29 C.F.R. § 541.200(a)(2) (emphasis added). The term "primary duty" means the "principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The regulations indicate that the amount of time devoted to exempt work is a helpful factor and that generally, if employees allocate 50 percent of their time

performing exempt work, the primary duty requirement will be satisfied. *Id.* Notably, "whether [employees'] particular activities excluded them from the overtime benefits of the FLSA is a question of law[,]" *Grage v. N. States Power Co.-Minnesota*, 813 F.3d 1051, 1054 (8th Cir. 2015) (alteration added), and "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the **character of the employee's job as a whole**." *Stofer v. James Greene & Assocs., Inc.*, No. 4:20-CV-00027-KGB, 2021 WL 1148708, at *7 (E.D. Ark. Mar. 25, 2021) (citing 29 C.F.R. § 541.700) (emphasis added).

Work in the following areas satisfies the second prong of the administrative exemption: tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; *advertising*; *marketing*; *research*; safety and health; *personnel management*; *human resources*; employee benefits; labor relations; public relations, government relations; computer network, internet and *database administration*; *legal and regulatory compliance*; and similar activities. 29 C.F.R. § 541.201(b) (emphasis added).

It is undisputed that Plaintiff was "[t]he sole person in the company [who] knew how the system [a human resource database built to ensure legal and regulatory compliance for federal contractors] worked, was managed, and as such [was] the sole interface with clients of the system." *Ex. 4* (Plaintiff's Depo.) at P. 95. As Plaintiff acknowledges, she "provided guidance and support to clients all the time." *Id.* at P. 69. The majority of Plaintiff's work included counseling clients regarding human resources best practices under the Applicant Harbor platform that she administered (*i.e.*, *database administration*), which was a *human resources* tool utilized by the upper management of Lighthouse clients to ensure *legal and regulatory compliance*. The

individual who currently serves as Director of Applicant Harbor Operations, Loryn Fugate, confirms the exempt nature of this position. **Exhibit 25**, *Declaration of Loryn Fugate*, at ¶ 13–31.

Plaintiff now downplays her position as only a clerical, data-entry technician role with no discretionary authority. However, this is nothing more than self-serving, unsubstantiated deposition testimony that falls woefully short of creating a genuine dispute of material fact. Again, whether Plaintiff was properly classified as exempt is a legal question, and the proper focus of this inquiry requires a "major emphasis on the character of the employee's job as a whole." *Stofer v. James Greene & Associates, Inc.*, No. 4:20-CV-00027-KGB, 2021 WL 1148708 (E.D. Ark. Mar. 25, 2021) (citations omitted).

In *Stofer*,[5] the Court considered remarkably similar facts in determining whether to properly grant summary judgment in another Hail Mary misclassification case. There, after Stofer was terminated from his position as Sales Manager for an insurance company, he sought unemployment insurance benefits from DWS. *Id.* at *4. Like Ms. Lee here, Stofer made representations to DWS in his application for unemployment benefits—*e.g.*, that his job duties included "consulting and coaching territory managers in six states, reporting to the President"—that were wholly inconsistent with the misclassification claims set forth in his Complaint. *Id.* Stofer attempted to downplay the exempt nature of his work through self-serving affidavit testimony by suggesting that he was simply responsible for "collecting, organizing, and disseminating information" in a "clerical role," *id.* at *8 (cleaned up), but it was undisputed that he "was over 'JGA's

---

[5] For full disclosure, undersigned counsel represented the employer-defendants, and the Sanford Law Firm represented Stofer.

Sales Division, which is a recognized department and subdivision of JGA's enterprise'" and that he "provide[d] feedback and guidance" to sales agents in the field. *Id.* Although he argued that his primary duty did not include the exercise of discretion and independent judgment with respect to matters of significance, the Court found that because he developed training and protocols for the company, he "exercise[d] discretion and judgment in the ways that sales were made at JGA." *Id.* at *10. Considering the "character of [his] job as a whole," *id.* at *7 (citing 29 C.F.R. § 541.700), the Court held that Stofer was not "simply following set scripts and well-established techniques, procedures, or specific standards described in manuals or other sources[,]" *id.* at *10 (citations omitted), and "his role was more than one of 'collecting and disseminating information.'" *Id.* at *8. Consequently, the Court entered summary judgment in defendants' favor because—as a matter of law—Stofer was properly classified as exempt under both the Executive and Administrative Exemptions. *Id.* at *10.

Plaintiff's claims should suffer the same fate as Stofer's allegations of misclassification. Like Stofer, Plaintiff's duties as Director of Applicant Harbor Operations were not simply "clerical"—she was responsible for one of the two business units recognized in Lighthouse's organizational structure. The exempt character of her position is revealed by Plaintiff's own admissions. She was the "sole person" responsible for Applicant Harbor and she provided advice to federal contractors regarding the legal and regulatory obligations "all the time." *Ex. 8* (Unemployment Appeal Records) at P. 2; *Ex. 4* (Plaintiff's Depo.) at P. 95.

There is no genuine question of fact or law as to whether Plaintiff's primary duty was "the performance of office or non-manual labor directly related to the [human

resource] management [and] general business operation of [Lighthouse clients]," and therefore, Defendants easily satisfy their burden under 29 C.F.R. § 541.200(a)(2).

> **3.    Plaintiff's primary duties as Director of Applicant Harbor Operations required her to exercise discretion and independent judgment on behalf of Lighthouse with respect to matters of extreme significance for its customers.**

The third prong of the administrative exemption requires an employee's primary duty to involve the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a)(3). "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Plaintiff engaged in this analysis "all the time" in the course of her employment. *Ex. 4* (Plaintiff's Depo.) at P. 69 ("Well, I would provide guidance and support to clients all the time."). The regulations make evident the fact that an employee is supervised or is required to work within guidelines does not undermine the exempt status:

> The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review.

29 C.F.R. § 202(c); *see also Viola v. Comprehensive Health Mgmt.*, 441 Fed. App'x 660 (11th Cir. 2011) (concluding an employee exempt pursuant to the administrative exemption even though she was "required to submit most of her plans to management before they were finalized . . ..").

"The term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 202(a). The regulations set forth factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance, including:

1.  Whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;

2.  Whether the employee carries out major assignments in conducting the operations of the business;

3.  Whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;

4.  Whether the employee has authority to commit the employer in matters that have significant financial impact;

5.  Whether the employee has authority to waive or deviate from established policies and procedures without prior approval;

6.  Whether the employee has authority to negotiate and bind the company on significant matters;

7.  Whether the employee provides consultation or expert advice to management;

8.  Whether the employee is involved in planning long- or short-term business objectives;

9.  Whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices.

29 C.F.R. § 541.202(b). Finally, courts are directed to apply the phrase "discretion and independent judgment" in light of all the facts involved in a particular employment situation. 29 C.F.R. § 541.202(b).

Here, Plaintiff's email correspondence with Lighthouse clients, the service agreements that she entered into on behalf of Lighthouse, the résumé that she drafted in

2019, and her sworn statements to the Appeal Tribunal in her appeal of the DWS's denial of unemployment benefits leave no doubt that her primary duties involved the exercise of discretion and independent judgment on behalf of Lighthouse.

### Plaintiff's Email Correspondence While Director of Applicant Harbor Operations

First, the Court should consider the various emails Plaintiff authored, which she admits were never subject to review or approval by any superior, and which demonstrates her exercise of discretion and judgment on behalf of Lighthouse. Notably, never during Plaintiff's communications with Lighthouse clients did she refer the client to President Ankeny for clarification. Nor did she ever explain that she is simply a clerical worker engaged in data entry who could not answer their regulatory-compliance questions. The emails below can only be explained if Plaintiff exercised discretion and judgment on behalf of Lighthouse. She did, "all the time." *Ex. 4* (Plaintiff's Depo.) at P. *69.*

For instance, on March 22, 2017, Plaintiff sent an email to Ankeny, Robinson, Phillips, and Greta Gay advising that a sales lead on a school district may be a "long shot" requiring certain services that Applicant Harbor does not provide. She concluded the email: "**Remember, I'm the 1 and only person that operates, manages, and supports AH. <u>It's a 24.7 duty, not just, sell, deliver and done</u>**." *Ex. 10* (Essential Functions Emails) at P. 1.

On May 10, 2017, a client asked Plaintiff, "Since we are not required to maintain a log that includes unsolicited applications how does the system handle that?" Plaintiff responded, "Do not take unsolicited paper applications! The [Applicant Harbor] system

is an opt in process, candidates can only apply to a position if there is one open." *Ex. 14*

(HR Guidance Emails) at P. 4; *Ex. 4* (Plaintiff's Depo.) at P. 152.

On June 19, 2017, Plaintiff sent an email to an Applicant Harbor client, stating:

> You don't want your list of applicants to be too long and unmanageable, this could cause more liability for you . . . if you have a requisition that has closed and/or was filled in the last couple of months and you need to hire more people into it, just go to the requisition, add openings and hire more from that list. In any case, you don't want to show a trend of cherry picking from lists, you need to be able to explain and defend why you hired someone over why you didn't hire someone else. I hope this helps and makes sense.
>
> You can call me to visit about this if you'd like.
>
> Debbie Lee
> Director, Applicant Harbor

*Ex. 14* (HR Guidance Emails) at P. 5; *Ex. 4* (Plaintiff's Depo.) at P. 152–53.

On August 31, 2017, a client asked Plaintiff whether a job applicant who applied

through the client's Applicant Harbor site could be "copied" to another job "requisition"

without having to reapply. Plaintiff responded, "Yes, I can do that for you but we don't

want to make this a pattern or it will show discrimination." *Ex. 12* (Legal Compliance

Emails) at P. 6; *Ex. 4* (Plaintiff's Depo.) at P. 112–13.

On September 21, 2017, Plaintiff sent an email advising an Applicant Harbor

client as follows:

> . . . [K]eep all applications for at least 2 years from the date of making. (Some lawyers say 3 years, some say more) The requirement to log and store Race, Gender, Ethnicity, Pre-VEVRAA and Pre-Disability is 3 years. Therefore, we advise to store 3 years of applications too. . . . I have always advised that you don't purge your AH site. If you are audited by the OFCCP, we will take care of you and purge your site appropriately at that time. In the event of an OFCCP audit, you would only have to present the logs, I've not heard of or seen any instances when applications are requested or required, unless you take them in all different forms. You don't do that, you only accept applications through your requisition postings

on your AH site. We have you covered and we've got your back. I wouldn't worry about an audit, especially since you have always done things right.

Debbie Lee
Director, Applicant Harbor

*Ex. 12* (Legal Compliance Emails) at P. 8 (emphasis added); *Ex. 4* (Plaintiff's Depo.) at

P. 115.

On April 11, 2018, Plaintiff sent the following email in response to an Applicant

Harbor client's question as to translating applications from English to Spanish:

In reference to your question about having your site and application translated into Spanish. This is not something that would need to be enabled in [Applicant Harbor]. All browsers have the translate setting option. I can come up with some very short instructions on your home page for FireFox, IE and Chrome. They all work very differently . . . . Also, normally there is an hourly rate charge for new templates but I will waive the fee because you are a loyal longtime client.

*Ex. 11* (Applicant Harbor Emails) at P. 18 (emphasis added); *Ex. 4* (Plaintiff's Depo.) at

P. 145–47.

On August 20, 2018, Plaintiff sent an email advising a client (a bank) that it was

acceptable to keep criminal conviction questions on the applications on the client's

Applicant Harbor site as a business necessity given that bank employees handle money.

*Ex. 12* (Legal Compliance Emails) at P. 13; *Ex. 4* (Plaintiff's Depo.) at P. 131–32. Plaintiff

testified at her deposition that she did not draft the language used but instead pulled the

language from another application. *Ex. 4* (Plaintiff's Depo.) at P. 222–24. Even so,

Plaintiff nevertheless used her own judgment and discretion in deciding that the

information was germane and needed to be shared with the client. This is the day-to-day

human resource related analysis and synthesis in which Plaintiff routinely engaged as

Director of Applicant Harbor Operations.

On January 8, 2019, Plaintiff sent an email notifying a client that she "updated [the] application template to comply with the new Connecticut salary history ban" and asking the client to "let [her] know if [the client] ha[s] any questions or concerns about anything pertaining to Federal requirements and/or Applicant Harbor." *Ex. 12* (Legal Compliance Emails) at P. 15; *Ex. 4* (Plaintiff's Depo.) at P. 132–33.

On January 10, 2019, Plaintiff sent an email to an Applicant Harbor client, stating:

> We don't have an integration with any type of skills tests because most aren't validated. . . . I would steer away from it if I had to give my opinion and knowing the history of issues that can arise when using a skills test. You don't want to go down the road of disqualifying candidates based on anything subjective or anything other than job qualifications.

*Ex. 4* (Plaintiff's Depo.) at P. 159–60.

On March 26, 2019, Plaintiff sent an email to a representative of SHRM, stating: "I'm a director and trainer for an ATS that is modeled around OFCCP compliance. I follow the DOL OFCCP/EEOC regulations and Directives to keep our AAP and ATS clients up to date and compliant." *Ex. 10* (Essential Functions Emails) at P. 3; *Ex. 4* (Plaintiff's Depo.) at P. 106–07.

On March 28, 2019, Plaintiff sent an email to a SHRM representative stating, "I'm the director of ATS operations, implementation and training. **I have expert knowledge in OFCCP regulations and requirements for compliant applicant tracking and provide guidance to our federal contractor clients.**" *Ex. 10* (Essential Functions Emails) at P. 4 (emphasis added).

On July 2, 2019, Plaintiff sent an email to a client providing an example of language to include to obtain consent for a background check from job applicants. She

explained further, "SHRM has information about how to best handle . . . Let me **research** those and give you my thoughts. Also, your attorney should have advice on how we should handle this in your online application process. I can draft something that you can get approved by your attorney to save time and effort for you." *Ex. 11* (Applicant Harbor Emails) at P. 21; *Ex. 4* (Plaintiff's Depo.) at P. 110–11.

On September 29, 2019, an Applicant Harbor client sent Plaintiff an email regarding its job application on the client's Applicant Harbor website. Plaintiff responded, "you can still inquire about expected rate of pay, just not current or previous employment pay." The client responded, "Are you sure? Everything I've read states we cannot." This would have been an appropriate time to explain that she was actually just a data technician or clerical worker if that was actually true. Because she was not simply a data technician or clerical worker, instead of forwarding the email to some other employee, Plaintiff replied, "**everything I've researched** and read says you can inquire about desired salary just not previous/current salary." *Ex. 12* (Legal Compliance Emails) at P. 23 (emphasis added); *Ex. 4* (Plaintiff's Depo.) at P. 135–36.

Throughout the relevant time period, Plaintiff also provided guidance and recommendations to assist clients in customizing their Applicant Harbor website integrations. *Ex. 11* (Applicant Harbor Emails) at P. 3, 6–10, 18–19, 21–26, 29-30. For example, one client provided Plaintiff with a job description, and Plaintiff developed "qualifying questions."[6] *Id.* at P. 11. On another occasion, Plaintiff offered "suggestions on updating [the client's] application template," opining that it should be "much shorter." *Id.* at P. 18. Using her independent judgment, Plaintiff recommended

---

[6] A "qualifying question" is a question in an application that requires the applicant answer "yes" in order to be satisfy basic minimum qualifications. *See Ex. 4* (Plaintiff's Depo.) at P. 95.

alterations to specific sections of the application to achieve an effective and legally compliant, yet more concise application. *Id.*

The correspondence above shows Plaintiff administering and managing Applicant Harbor systems, which are built to ensure legal and regulatory compliance. Poor management of the system would clearly place clients in legal jeopardy, thereby threatening significant financial harm to both the client and Lighthouse. Despite Plaintiff's carefully crafted pleadings and use of adjectives and legal conclusions to grossly downplay her job duties, the overwhelming evidence demonstrates Plaintiff's primary work affected the "operation of a particular segment [Applicant Harbor] of [Lighthouse's] business." 29 C.F.R. § 541.202(b)(3).

### *Plaintiff's Authority to Execute Contracts and Set Pricing on Behalf of Lighthouse*

Second, the record establishes that Plaintiff had authority to commit the employer in matters that have significant financial impact, *i.e.*, Applicant Harbor Service Agreements.

On March 10, 2017, Plaintiff signed an Applicant System Services Agreement as Director of Applicant Harbor Operations, warranting that Lighthouse would maintain a secure Applicant Harbor site for exclusive use by the client, Rope Swing Group. *See Ex. 1* (Phillips Supp. Decl.) at ¶ 31; *Ex. 16* (AH Service Agreements). The CEO of Rope Swing Group signed the Agreement agreeing that client would pay Lighthouse a one-time setup and training fee of $3,995 and $550 per month thereafter. *Id.* at P. 1.

Plaintiff nevertheless testified during her deposition that she did not have the authority to enter into contracts on behalf of Lighthouse. Her testimony is as fine an example of self-serving, unsubstantiated testimony as one will read:

Q.  Do you recognize this document?
A.  Yeah. It's the Service – it's the Services Agreement.

Q.  Is that your signature at the bottom?
A.  It sure is.

Q.  And you signed on behalf of Lighthouse?
A.  I did.

Q.  And you signed as Director, Applicant Harbor Operations?
A.  Sure.

Q.  Is this a contract?
A.  It's a contract, but it's not a contract with me.

Q.  I said: Did you have authority to enter into contracts on behalf of Lighthouse?
A.  I did not. I had to get approval on everything I did. David would look at contracts. Every single contract I ever got, David looked at and signed. Or if he wasn't there, he said I could sign it for him.

Q.  Well, you didn't sign this for David, right?
A.  David approved it and I signed it.
. . .
Q.  Is this your name on the contract?
A.  I signed it for Lighthouse.

Q.  Is that a yes?
A.  No.

Q.  You – you're under oath; you understand that, correct?
A.  I never had authority to sign a contract, no.
. . .
Q.  So you had no authority to sign this contract and you did?
A.  Apparently I didn't know I needed authority, written authority. It was approved, so I just signed it.

Q.  What title is listed under the contract?
A.  You've already stated the title.

Q.  Could you read it for me, please.
A.  Director, Applicant Harbor Operations. That's the title that I picked for myself out of the air.
. . .

> Q. So this was the only contract that has your printed name and
> title on it?
> A. Yes.
>
> Q. Okay.
> A. I guess maybe it's not a valid contract then.
>
> Q. This is not a valid contract?
> A. If I didn't have approval to sign.

*Ex. 4* (Plaintiff's Depo.) at P. 186–89.

In fact, Plaintiff signed System Service Agreements at least three more times on behalf of Lighthouse during the relevant time period, though additional examples abound. *See Ex. 16*. As she explained, "David Ankeny was never there to review anything." *Ex. 4* (Plaintiff's Depo.) at P. 114.

On April 18, 2017, Plaintiff signed an Applicant System Services Agreement as Director of Applicant Harbor Operations warranting that Lighthouse would maintain a secure Applicant Harbor site for exclusive use by the client, Heim Bearings Company. *Id*. at 3. The Vice President and General Manager of Heim Bearings Company signed the Agreement, agreeing to pay Lighthouse a one-time setup and training fee of $2,995 and $475 per month thereafter. *Id*.

On June 14, 2018, Plaintiff emailed a client explaining, "I'm not going to charge you for the new template. Usually there is a $250 fee but I'm going to waive it because you are a loyal client ;-)." *Ex. 18* (Price Setting and Contracting Authority Emails) at P. 13. Plaintiff made this decision because "[t]he new template fee was not written on a policy or a guideline. It was just willy-nilly up in the air[,]" and she exercised her own authority because she was "trying to just be nice to the client, you know . . . it was a feely-feely email." *Ex. 4* (Plaintiff's Depo.) at P. 199. In other words, fee waivers were solely committed to Plaintiff's discretion, and she frequently exercised that discretion

because doing so helped her earn additional bonus income. *Id.* at P. 30 ("At the end of every year there was [a] profit sharing [bonus].").

On April 2, 2019, Plaintiff signed an Applicant System Services Agreement as Director of Applicant Harbor Operations warranting that Lighthouse would maintain a secure Applicant Harbor site for exclusive use by the client, Essick Air Products, Ltd. *Ex. 16* (AH Services Agreements) at P 5. The Human Resources Director of Essick Air Products, Ltd. signed the Agreement, agreeing to pay Lighthouse a one-time setup and training fee of $2,995 and $150 per hire thereafter. *Id.*

On April 22, 2019, Plaintiff emailed a potential client, stating "I wanted to follow up with you and learn if you had made a decision on an applicant tracking system yet. I'd be happy to do another demo or answer any question for you." *Id.* at P. 15. The potential client responded, ". . . I am hoping to get a chance to start making some decisions in a couple of weeks. *Id.* Thanks for checking in[.]" *Id.* Plaintiff then replied, "Don't forget, if price is an issue or decision maker, I'm flexible." *Id.* In this respect, Plaintiff controlled the amount of her "SPIFF" bonus. *Ex. 4* (Plaintiff's Depo.) at P. 203.

On July 2, 2019, Plaintiff signed an Applicant System Services Agreement as Director of Applicant Harbor Operations warranting that Lighthouse would maintain a secure Applicant Harbor site for exclusive use by the client, City Light Gas and Water (CLGW). *Ex. 16* (AH Services Agreements) at P. 7. The Superintendent of Utilities for CLGW signed the Agreement, agreeing to pay Lighthouse a one-time setup and training fee of $3,995 and $175 per hire thereafter. *Id.*

The objective, irrefutable evidence demonstrates that Plaintiff routinely exercised discretion and independent judgment with respect to matters of significance. If more were needed, however, the following provides abundant basis.

### *Plaintiff's Responsibilities for all Lighthouse Marketing*

Third, although Plaintiff testified at one point in her deposition that she was not responsible for marketing (*see Ex. 4* (Plaintiff's Depo.) at P. 207), on February 1, 2019, she sent an email saying precisely the opposite:

> Hi [client] I have a request for you. When you have a moment, will you please rate and write a review on our SHRM vendor listing? Maybe mention that [client] is my longest, most loyal, great client? ;-) Wait, that was my review for [client]. LOL. But seriously, I would appreciate it from you. The link is below. **I'm responsible for LH and AH marketing efforts**. I'm also a member of SHRM and CAHRA (Central AR HR Assoc.). The site link below is the SHRM vendor listing **I implemented about 4 months ago**. I love the SHRM site, it has so much useful information and articles plus chat logs in different categories with other members for getting real world advice or suggestions. I like the friendliness and the way it helps HR people all over the US work together so friendly. Anyway I'm rambling now.
> . . .
> Thank you, [client] Have a great weekend.
> .
> Debbie Lee
> Director Applicant Harbor ATS Operations

*Ex. 19* (Marketing Emails) at P. 6 (emphasis added). In fact, Plaintiff was permitted $5,000 discretion to spend on marketing initiatives for Lighthouse. *Ex. 3* (Ankeny Supp. Decl.) at ¶ 39.

On July 22, 2019, Plaintiff emailed Central Arkansas Human Resources Association, stating: "Hi . . . I'm interested in having Lighthouse Compliance Solutions and Applicant Harbor ATS listed on the Partners page of the CAHRA website." *Id.* at P. 21–22. Once the listing was posted online, Plaintiff emailed to say "I'm really so pleased with the listing, it looks great. Thank you." *Id.*

As she eventually testified, however, Plaintiff was in fact "responsible for the Lighthouse and Applicant Harbor marketing effort." *Ex. 4* (Plaintiff's Depo.) at P. 207.

### *Plaintiff's Résumé*

Fourth, Plaintiff's own résumé, which she drafted prior to this litigation in 2019, described her work at Lighthouse as follows: "continuously follow and research DOL-OFCCP and EEOC initiatives in reference to applicant tracking and AAP compliance," "provide guidance and support to clients in their recruiting efforts in compliance with OFCCP and EEOC guidelines," "providing technical assistance to job candidates," "develop and manage new account relationships," "negotiate and complete contracts with third party vendor integrations," and "execute continuation of compliance and system enhancements," "design and manage Constant Contact marketing and client alerts," "manage and deliver collaboration project with third-party web designer to develop new company website," and "update, manage and maintain company website." *Ex. 2* (Plaintiff's Résumé); *Ex. 9* (Plaintiff's Job Description).

While Plaintiff testified that her résumé was "inflated," *Ex. 4* (Plaintiff's Depo.) at P. 207, this document—in her own words—emphasizes that the "character of [her] job as a whole" falls within the administrative exemption. *See Stofer*, 2021 WL 1148708, at *7 (E.D. Ark. Mar. 25, 2021) (citations omitted). As she explained, Plaintiff's position required an understanding of OFCCP's guidelines so that she "knew what to tell clients." *Ex. 4* (Plaintiff's Depo.) at P. 246. This is precisely what it means to "compar[e] and . . . evaluat[e] . . . possible courses of conduct, and . . . [then] mak[e] a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a).

### *Plaintiff's Petition to Appeal DWS's Denial of Unemployment Benefits*

Fifth, consider her Petition to the Appeal Tribunal following the denial of her unemployment benefits. In that Petition, Plaintiff described her role as "manag[ing] the operations of the Applicant Tracking System (ATS)." *Ex. 8* (Unemployment Appeal

Records) at P. 2. She represented that she was "the sole person in the company that knew how the system worked, was managed, and as such, [Plaintiff] was the sole interface with clients (users) of the system." *Id.* She further declared that the "there was no product delivery to the customers without [her]," that she was an "exempt, salaried employee" who "interfaced with clients to help them post their jobs and troubleshoot the system for them beyond the standard workday, from the office or from home." *Id.* As Director of Applicant Harbor Operations, Plaintiff "consistently received positive feedback from clients for [her] **professional guidance** . . . [and,] [o]ver the years . . . sought to expand [her] duties by taking on additional projects with the intention of expanding our customer base by professional networking, developing training and seminars, and recommending improvements to the actual system. [Plaintiff] also took the initiative to become professionally certified[.]" *Id.* (emphasis added).

   As repeatedly demonstrated by Plaintiff's own words and actions, her work required discretion and independent judgment with respect to matters of significance. If it did not, her claims that she worked twenty-four hours a day would make little sense for a lowly data-entry clerk. But this evidence not only stands to demonstrate the abject falsity of Plaintiff's self-serving testimony—it also serves to provide the Court with objective evidence regarding Plaintiff's duties at the time during which she held the position of Director of Applicant Harbor Operations. Plaintiff had no reason to inflate her duties when she filed for unemployment benefits. She explained that her position required exempt-level work because that was the truth then, just as it is true today. Because Plaintiff was properly classified as exempt pursuant to the FLSA's administrative exemption, Defendants are entitled to summary judgment on each of Plaintiff's claims.

256626                                    31

**B.      Plaintiff was Properly Exempt Under the FLSA's "Combination" Exemption.**

Exemptions to the FLSA's overtime provisions are entitled to a fair reading— "[t]hat is, those exemptions are not to be construed narrowly." *Friedman v. Nat'l Indem. Co.*, No. 8:16-CV-258, 2018 WL 1954218, at *2 (D. Neb. Apr. 13, 2018) (citing *Encino Motorcars*, *supra* at 1142). This flexible standard is illustrated by the DOL's recognition of a hybrid or so-called "combination exemption," which is intended to address "the situation that exists when an employee does not meet the primary-duty requirement of any individual exemption[,]" *id.* at *5 (citing *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 294 (4th Cir. 2007)), to wit:

> Employees who perform a combination of exempt duties as set forth in the regulations in this part for **executive**, **administrative**, professional, outside sales and computer employees may qualify for exemption. Thus, for example, an employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption. In other words, work that is exempt under one section of this part will **not defeat the exemption under any other section**.

29 C.F.R. § 541.708 (emphasis added). Here, if the Court is not inclined to enter summary judgment under the administrative exemption, it should nevertheless hold that Plaintiff performed exempt work under a combination of the administrative and executive exemptions.

The first element of the executive exemption requires the employee to be paid on a salary basis. 29 C.F.R. § 541.100(a)(1). It is undisputed that Plaintiff was paid on a salary basis in excess of the minimum salary requirement effective during the relevant time period. *See Ex. 5* (Payroll Records).

The second element of the executive exemption requires that the employee's "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof." 29 C.F.R. § 541.100(a)(2). There is no question that Applicant Harbor is a recognized department within Lighthouse's organizational structure, *Ex. 1* (Phillips Supp. Decl.) at ¶ 6, and Plaintiff admits that as Director of Applicant Harbor Operations, she was "[t]he sole person in the company [who] knew how the system worked, was managed, and as such[,] [was] the sole interface with clients of the system." *Ex. 4* (Plaintiff's Depo.) at P. 95. Therefore, there is no dispute that Plaintiff satisfied the second element of the executive exemption.

There is also no dispute, however, that Plaintiff does *not* satisfy the remaining elements for the executive exemption's application here—she did not customarily and regularly direct the work of two or more other employees, and she had no authority to hire and fire. 29 C.F.R. § 541.100(a)(3)–(4). It still remains, however, that Plaintiff managed an entire division of this five-person company and, in that capacity, routinely provided advice regarding hyper-technical employment requirements imposed on federal contractors. In Plaintiff's words, she has "expert knowledge in OFCCP regulations and requirements for compliant applicant tracking and provide[d] guidance to [Lighthouse's] federal contractor clients." *Ex. 10* (Essential Functions Emails) at P. 4.

A "fair reading" of the voluminous evidence before the Court demonstrates that Plaintiff's primary duties included a combination of both management and administration, and under 29 C.F.R. § 541.708, Lighthouse is alternatively entitled to summary judgment under the hybrid exemption.

**C.      Plaintiff Did Not Work Overtime.**

Even if Plaintiff could overcome the insurmountable evidence establishing her proper pay classification under the FLSA and AMWA—she cannot—the Court should alternatively hold that Plaintiff is not entitled to overtime because her self-serving testimony regarding her hours worked contradicts itself, and moreover, because she admits that Lighthouse had no knowledge of her alleged overtime work. Where an employer has no knowledge of uncompensated work, the employer's failure to pay for the overtime hours is not a violation of the FLSA. *Forrester v. Roth's I. G. A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981). In other words, an employee can only prevail on an overtime claim if she actually worked overtime *and* "the employer knew or should have known that [s]he was working overtime." *Kertis v. Parkway Vill., Inc.*, No. 4:18-CV-650, 2019 WL 7163429, at *3 (E.D. Ark. Nov. 12, 2019).

Here, although Plaintiff admits that she has no record of the time she actually worked, *Ex. 4* (Plaintiff's Depo.) at P. 257–58, she begins her fantasy by alleging that she was "on call 24/7" and that she "respond[ed] to [client emails] 24 hours a day." *Ex. 4* (Plaintiff's Depo.) at P. 20. Then, Plaintiff claims that she "worked between . . . 35 hours" and "60 hours" each week. *Id.* at P. 260. And while she cannot recall whether she worked over 40 hours during the weeks of Christmas, the Fourth of July, or otherwise during her vacations, *id.* at P. 263–64, Plaintiff was quick to engage in speculation and conjecture when she later changed tack and testified that she worked 60 hours per week, even during those holidays. *Id.* at P. 263. Likewise, while she had frequent absences due to her own medical condition as well as her child's, Plaintiff alleged that she was able to work 60 hours a week because she worked from home. *Id.* at P. 266–74; *Ex. 6* (Gay Supp. Decl.) at ¶ 40–45. And while she cannot recall how many "exact weeks that [she]

worked over 40 hours," perhaps "80 . . . [to] 85 percent" of the time, *id.* at P. 298–99, she also said that "**[i]f it were up to [her]**, [she] would claim 60 hours a week or – at least three weeks out of the month." *Id.* at P. 260 (emphasis added).

Apparently, however, the overtime wages she claims is decidedly *not* "up to her." Instead, "[her] lawyer is doing that calculation or coming up with a number. [Plaintiff] do[es]n't have a [number]." *Id.* at P. 302. The "numbers" her counsel presented—50 hours in each and every week, with suspiciously *no* variation from March 30, 2017 through **November 29, 2019**,[7] even for the pay periods that included the Fourth of July, Memorial Day, Thanksgiving, and Christmas—have no relationship with Plaintiff's testimony. **Exhibit 26**, *Plaintiff's Supplemental Disclosures*, at P. 8. These conflicting positions defy common sense and demonstrate the rather specious nature of Plaintiff's claims.

Whether Plaintiff was actually misclassified (she was not) and worked overtime hours matters very little, however, because Plaintiff concedes that no one who worked for Lighthouse—no one who actually has knowledge of the work she performed—could corroborate her allegations regarding her claimed hours worked. *Ex. 4* (Plaintiff's Depo.) at P. 291. Plaintiff even equivocated about whether her own husband would testify in support of those allegations. *Id.*

It is certainly true that no Lighthouse employee believes Plaintiff worked more than 40 hours during any workweek. Ms. Gay, who worked alongside Plaintiff in adjacent offices, swore in her Declaration that Plaintiff "worked fewer hours than any

---

[7] Plaintiff's employment was terminated on October 3, 2019. *Ex. 3* (Ankeny Supp. Decl.) at ¶ 49. She continued receiving compensation for the next two months in exchange for her now-broken promises under the Confidential Severance Agreement. *See Ex. 23.*

other individual employed by Lighthouse," and she went on to explain that Plaintiff rarely worked before 9:30 a.m. or after 4:00 p.m., that she "rarely, if ever, worked on Fridays," and that she missed work frequently because of her health condition, childcare obligations, and to attend to her separate house-cleaning business. *Ex. 6* (Gay Supp. Decl.) at ¶ 39–46, 60. Ms. Phillips, Lighthouse's Controller who worked just 8 feet away from Plaintiff, similarly provided declared under penalty of perjury that she "rarely" saw Lee work more than 40 hours in a workweek. *Ex. 1* (Phillips Supp. Decl.) at ¶ 33. And Ms. Fugate, who was trained by Plaintiff, wrote in her Declaration that "Ms. Lee was never in the office more than 40 hours in a week," and that Ms. Fugate—performing the same tasks—completes all of her duties in "fewer than 40 hours a week." *Ex. 25* (Fugate Decl.) at ¶ 33–34.

As a matter of fact, and even viewed in a favorable light, Plaintiff failed to adequately and credibly articulate any actual entitlement to overtime. As a matter of law, however, it is inconsequential whether Plaintiff worked 50, 60, or 80 hours per week because she was properly exempt. But even if she was not, Plaintiff admits that no one in management had any actual knowledge of the hours she allegedly worked. *Ex. 4* (Plaintiff's Depo.) at P. 258–59 ("I have no idea what David knows or knew"). Mr. Ankeny's sworn Declaration explains that Plaintiff was frequently absent, late, and left work early; that he had no knowledge of Plaintiff working after-hours or during any weekends; and that he never asked her to work after-hours or on the weekends. *Ex. 3* (Ankeny Supp. Decl.) at ¶ 50–55. Indeed, "she was working so little that [he] was concerned . . . and told her so, more than once." *Id.* at ¶ 63. Because Plaintiff cannot establish that Lighthouse had any knowledge of her hours worked, which she allegedly performed "at home" through emails that Mr. Ankeny undisputedly never reviewed,

Defendants are entitled to summary judgment notwithstanding Plaintiff's proper exempt classification.

**D.      Plaintiff Cannot Prove any Willful Violation of the FLSA or AMWA.**

The general statute of limitations applicable to the FLSA is two years. 29 U.S.C. § 255(a). The FLSA contains a three-year statute of limitations that is applicable *only* if a violation of the FLSA occurred and the violation was deemed willful. *Id*. Plaintiff failed to establish any violation of the FLSA, but assuming *arguendo* that she could survive this Court's careful scrutiny under Rule 56, she nevertheless failed to establish any willful violation that would avail her to a three-year statute of limitations and treble damages.

Willfulness requires a showing that the employer knew or showed reckless disregard for whether its conduct violated the FLSA. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). To qualify for the three-year statute of limitations, Plaintiff bears the sole burden of proof. *Bennet v. Carl's Towing, L.L.C.*, 2005 WL 2101002, at *8 (W.D. Mo. 2005) (citations omitted).

Mere negligence, mere failure to seek legal advice regarding a pay practice, or a good faith but erroneous assumption that a pay plan complied with the FLSA do not and can never constitute a willful violation. *See Bennet*, 2005 WL 2101002, at *8. Further, neither "an employer's general knowledge about the statute's potential applicability, nor an employer's lack of a 'reasonable basis for believing that it was complying' with the FLSA, is by itself sufficient to demonstrate an employer's willfulness." *Langston v. Summit Health & Rehab., LLC*, 2015 WL 4528662, at *1 (W.D. Ark. July 27, 2015).

Here, Plaintiff did not establish any violation of the FLSA or AMWA, much less a willful violation. The only testimony Plaintiff advanced in support of her allegation of a

willful violation was that "the owners" of Lighthouse are "employment lawyers" and "[t]hey should have known better." *Ex. 4* (Plaintiff's Depo.) at P. 302. This testimony is insufficient evidence to establish willfulness, and it equally demonstrates that Lighthouse had a reasonable basis in determining Plaintiff's proper exempt classification for wage and hour purposes. And as Mr. Ankeny's Declaration demonstrates, he believes in good faith that Plaintiff was properly classified. *Ex. 3* (Ankeny Supp. Decl.) at ¶ 47.

It is also notable that while Plaintiff "asked David for a raise," she admits that she never complained about her exempt classification. *Ex. 4* (Plaintiff's Depo) at P. 275. It should not be lost on the Court that Plaintiff has a deeper familiarity with the concepts of exempt and non-exempt classifications than most because she frequently discussed these topics with Lighthouse clients. *Id.* at P. 35–36 (selecting exempt or non-exempt on a client's application "was a choice when you set up a position"). Plaintiff acknowledges that she was an exempt employee who was paid on a salary basis. *Id.* at P. 96. Indeed, she "got a salary because [she] was exempt." *Id.* at P. 96–97.

Absent any evidence of willfulness, and because Lighthouse's classification decision was made in good faith by attorneys who practice in the field of labor and employment law, the Court should alternatively enter summary judgment on Plaintiff's claim for liquidated damages if it is not inclined to fully dismiss her claims. *Chao v. Barbeque Ventures, LLC*, 547 F.3d 938, 942 (8th Cir. 2008).

**E.    Plaintiff Released and Waived Her Right to Bring a Claim under Either the FLSA or the AMWA in Exchange for Valuable Consideration.**

On October 9, 2019, Plaintiff executed a Severance Agreement with Lighthouse "and its related entities, agents, **officers**, employees, insurers, attorneys, and

associates." *Ex. 23* (Confidential Severance Agreement) at P. 1. Therefore, the Agreement encompasses not only Lighthouse, but Ankeny as well, as an officer of Lighthouse.

Under the terms of the Agreement, Lighthouse delivered to Plaintiff $10,300, less all lawful deductions—the equivalent of two months of Plaintiff's salary—in four equal installments occurring on Lighthouse's regularly-scheduled payroll dates, and forgave and canceled payment by Plaintiff of amounts due and owing to Lighthouse in the amount of $8,150.97.[8] *Id.* at ¶ 1. In exchange for the foregoing consideration, Plaintiff:

> forever release[d] and discharge[d] Lighthouse from any and all claims . . . and liabilities she ha[d] or may have had, as of the date of the execution of [the] Agreement, arising out of or related to her employment with or separation from Lighthouse, including, but not limited to, claims arising under the Fair Labor Standards Act, . . . the Arkansas Minimum Wage Act, . . . and any other applicable Federal, State, or Local laws or regulations, . . . and/or claims for attorneys' fees and costs.

*Id.* at ¶ 2. Plaintiff agreed that the "consideration she reciev[ed] pursuant to th[e] Agreement [was] in excess of anything that she [was] otherwise entitled." *Id.* Accordingly, Defendants contend that Plaintiff's FLSA and AMWA claims against them should be dismissed.

Alternatively, in the event the Court decides that Plaintiff's FLSA claims could not be settled after her employment with Lighthouse concluded, Defendants contend that Plaintiff effectively waived her right to bring a claim under the AMWA. Defendants recognize that, ordinarily, FLSA rights are statutory and cannot be waived, *see Copeland v. ABB, Inc.*, 521 F.3d 1010, 1014 (8th Cir. 2008), and that, generally, the Court "may

---

[8] Lighthouse provided Plaintiff with a no-interest personal loan in the amount of $21,000, which Plaintiff was re-paying to Lighthouse at a rate of $50 per month at the time of the debt's cancellation.

rely on the interpretations of the U.S. Department of Labor and federal precedent established under the Fair Labor Standards Act in interpreting and applying the provisions of [the Arkansas Minimum Wage Act] . . . except to the extent a different interpretation is clearly required." ARK. ADMIN. CODE § 010.14.1-112; *see also Lyons v. ConAgra Foods Packaged Foods, LLC*, No. 4:12CV00245, 2013 WL 12304019, at *3 (Oct. 31, 2013) ("The AMWA has been interpreted to impose the same overtime requirements as the FLSA."). At the same time, as Judge Susan Webber Wright observed in *McCartney v. Bailey & Thompson Tax and Accounting, P.A. LTD*, there is "no statutory mandate or Eighth Circuit decision that requires court approval of the parties' private settlement agreement." *McCartney v. Bailey & Thompson Tax and Accounting, P.A. LTD*, Case No. 4:14-CV-561, at *Dkt. 12* (E.D. Ark. Feb. 19, 2015) (citing *Fascio v. Madison Health & Rehab LLC*, No. 4:12CV00600 (E.D. Ark. June 30, 2014) (order finding arms' length compromise of FLSA claims for overtime did not require court approval)). There, despite the Parties' request for Judge Wright to approve a settlement agreement, the Court observed that "court approval of the parties' settlement agreement is not necessary[.]" *Id.* at P. 2.

Under Eleventh Circuit precedent, there are only two ways in which FLSA claims can be settled or compromised by: (1) under "section 216(c), . . . an employee who accepts [] payment [of unpaid wages] supervised by the Secretary [of Labor] thereby waives his right to bring suit for both the unpaid wages and for liquidated damages;" and (2) upon a "district court [] enter[ing] a stipulated judgment after scrutinizing the settlement for fairness." *Lynn's Food Stores, Inc. v. U.S. By and Through U.S. Dept. of Lab., Employment Standards Admin., Wages and Hour Div.*, 679 F.2d 1350, 1353 (11th Cir. 1982). However, courts should only rely on interpretations of the FLSA in

"interpreting and applying the **provisions of the [AMWA]**." ARK. ADMIN. CODE § 010.14.1-112.

No rationale exists for the extrapolation of the interpretation of the FLSA to apply to the AMWA if there is no analogous provision in the AMWA. The provisions located in 29 U.S.C. § 216(b) and (c), *see Lynn's Food Stores*, 679 F.2d at 1353 (relying on sections 216(b) and 216(c) of the FLSA), or analogous provisions do not appear in the AMWA. Accordingly, the Court's waiver analysis under the FLSA should not be extended to the AMWA. Therefore, in the event Plaintiff did not effectively waive all claims she has pleaded in her Complaint, she did effectively waive her AMWA claim. Plaintiff's AMWA claims should be dismissed.

But the Court should extend Judge Wright's logic to apply to the FLSA because the Agreement was a product of an arms-length transaction during which Plaintiff was represented and advised by counsel during the negotiations undergirding the Agreement. As she testified, "[t]he only pe[rson] [she] spoke to about this [A]greement was [her] lawyer." *Ex. 4* (Plaintiff's Depo.) at P. 289.[9] Because this was an arms-length transaction with both parties represented by counsel, after Plaintiff's termination, the Court should enforce the Agreement without exception.

## F. Defendants Are Entitled to Summary Judgment on Their Counterclaim.

Lighthouse, including "its related entities, agents, officers," such as Mr. Ankeny, "employees, insurers, attorneys, and associates (collectively referred to as 'Lighthouse')," and Plaintiff, including "her dependents, heirs, executors,

---

[9] It appears that Plaintiff was also represented by counsel when she filed her unemployment appeal. *See Ex. 8* (Unemployment Appeal Records), at P. 2 (erroneously including the note, "fill in the blank here with your certification").

administrators, successors, and assigns," voluntarily entered into the Severance Agreement. *Ex. 23.*

Under the Agreement, Lighthouse agreed to continue compensating Plaintiff pursuant to her regularly salary prior to her termination, less all lawful deductions, for two months following her termination, which was to be paid in four equal installments occurring on Lighthouse's regularly-scheduled payroll dates. *Id.* Under the Agreement, Lighthouse also agreed to waive, cancel, and forgive payment of amounts due and owing to Lighthouse for a personal, no-interest loan Plaintiff accepted from Lighthouse. *Id.* Lighthouse performed its obligations under the Agreement without exception. *Ex. 4* (Plaintiff's Depo.) at P. 288.

In exchange for the foregoing consideration, Plaintiff released Lighthouse from "any and all claims, obligations and liabilities" she had or may have had, as of the date of execution of the Agreement, arising out of or related to her employment with or separation from Lighthouse. *Id.* Specifically, Plaintiff agreed to release and waive "claims arising under the Fair Labor Standards Act, . . . the Arkansas Minimum Wage Act, . . . and any other applicable Federal, State, or Local laws or regulations, . . . and/or attorneys' fees and costs." *Id.* Plaintiff acknowledged that the consideration she received pursuant to the Agreement was "in excess of anything to which she [was] otherwise entitled." *Id.* Plaintiff acknowledged and agreed that Lighthouse "has a protected interest in maintaining and securing its reputation." *Id.* To that end, Plaintiff specifically agreed to not make "any disparaging or inappropriate remarks concerning Lighthouse or related entities, its owners, officers, or any current or former employee under any circumstances, whether work related or not." *Id.* "Any such remarks by Plaintiff could

have an adverse impact on the reputation of Lighthouse and would be considered a violation of th[e] Agreement." *Id.*

Additionally, Plaintiff acknowledged and agreed that for a period of three years following the execution of the Agreement, she would not, "directly or indirectly," "solicit . . . any client or customer to whom Lighthouse provides products and/or services at the time of Plaintiff's termination or at any time in the 12-month period preceding the date of Plaintiff's termination." *Id.*

Upon any violation or suspected violation of the Agreement, Lighthouse is expressly authorized to "present th[e] Agreement to any court of competent jurisdiction for purposes of obtaining injunctive and/or monetary relief, as well as damages arising from any breach." *Id.* Pursuant to the Agreement, the Parties agreed that, "[i]n light of the difficulty of ascertaining damages for violation of th[e] Agreement, Plaintiff acknowledges and agrees that, if she breaches . . . th[e] Agreement, she will, as liquidated damages, pay Lighthouse $18,450.97, as well as any other actual monetary damages established by Lighthouse, plus legal fees and costs incurred by Lighthouse." *Id.*

Plaintiff admitted during her deposition that, after she signed the Severance Agreement, she applied for a job with Centennial Bank: "I did apply for a job with Centennial Bank and got an interview, but it had nothing do with HR or affirmative action or anything." *Ex. 4* (Plaintiff's Depo.) at P. 292–94. Plaintiff admits that she knew Centennial Bank to be a client of Lighthouse—indeed, that she developed the business relationship while employed at Lighthouse. *Id.* Plaintiff further admits that after she received an interview request from Centennial Bank, she emailed the very Centennial Bank employee who was her contact while she worked for Lighthouse about the job. *Id.*

This is a clear breach of the Severance Agreement. Plaintiff took the money without ever expecting that she would be required to hold up her end of the bargain, and this lawsuit is simply a shakedown attempt intended at coercing a settlement.

The undisputed material facts constitute a breach of the Severance Agreement. Plaintiff admits that she breached the Agreement without equivocation. *Ex. 4* (Plaintiff's Depo.) at P. 290 ("Do you agree that that's a breach of the agreement? **I do**.") (emphasis added). Plaintiff has acknowledged the validity of the Agreement and admitted that she violated this Agreement when she attempted to solicit employment from Centennial Bank. Accordingly, Lighthouse is entitled to $18,450.97, as well as its attorney's fees and costs incurred by Lighthouse. *See Ballard Grp., Inc. v. BP Lubricants USA, Inc.*, 436 S.W.3d 445, 450 (Ark. 2014) (citing *Perry v. Baptist Health*, 189 S.W.3d 54, 58 (Ark. 2004)).

## V.   CONCLUSION

This case presents no question on the margins of whether Plaintiff was properly classified as an exempt employee. She was. Her claims are simply the product of her vindictive ends, "desperate" because she "lost everything that [she] [knew] for 15 years," *Ex. 4* (Plaintiff's Depo.) at P. 308—"like [her] whole world has crumbled without Applicant Harbor." **Exhibit 27**, *October 11, 2019 Text Message from Plaintiff to Ankeny*. The undisputed, irrefutable objective record evidence not only rebuts Plaintiff's self-serving and mendacious testimony, but it also serves to illustrate "the character of [her] job as a whole." *Stofer*, *supra* at *7 (citations omitted).

As a whole, Plaintiff routinely provided regulatory compliance advice to Lighthouse clients based on her own situational assessment and analysis of their needs against the government's requirements. In Lighthouse's highly-specialized and highly-

technical industry, Plaintiff's ability to respond to client inquiries inherently required the perpetual exercise of discretion and independent judgment with respect to matters of significance. She provided quasi-legal advice, signed contracts in her own name on Lighthouse's behalf, and made business and marketing decisions aimed at attracting and retaining clients so that she could continue enjoying her profit-sharing bonus—all without oversight or review. When viewed in the appropriate light, Plaintiff's efforts to downplay her duties—applying her "expert knowledge in OFCCP regulations and requirements" to "provide guidance to [Lighthouse's] federal contractor clients, *Ex. 10* (Essential Functions Emails) at P. 4—all while inflating her alleged hours worked are just silly.

Silly, self-serving testimony is wholly insufficient to evade Rule 56's proper application here. There is no universe of possibilities in which Plaintiff was misclassified. Nor is there any question that Plaintiff breached her Agreement with Lighthouse—she readily admits that she did. *Id.*, p. 290. Because there is no question of material fact that requires a jury's consideration, Defendants respectfully request the Court enter summary judgment in their favor by dismissing Plaintiff's claims and awarding Lighthouse $18,450.97, plus legal fees and costs, on its Counterclaim.

Respectfully Submitted,

Abtin Mehdizadegan, Ark. Bar No. 201313
Alexander D. Clark, Ark. Bar No. 2017112
CROSS, GUNTER, WITHERSPOON
  & GALCHUS, P.C.
500 President Clinton Avenue, Suite 200
Little Rock, Arkansas 72201
Phone: (501) 371-9999
Fax: (501) 371-0035
abtin@cgwg.com
aclark@cgwg.com
ATTORNEYS FOR DEFENDANTS